```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                        SOUTHERN DIVISION

 3

    RODERICK CLARK MILLER,
 4      Plaintiff,

 5  VERSUS                     CAUSE NO: 1:07cv541-LG-JMR

 6  HARRISON COUNTY, MISSISSIPPI,
    BY AND THROUGH ITS BOARD OF
 7  SUPERVISORS, HARRISON COUNTY
    SHERIFF DEPARTMENT, SHERIFF
 8  GEORGE PAYNE, OFFICIALLY AND
    IN HIS INDIVIDUAL CAPACITY,
 9  DIRECTOR OF CORRECTIONS MAJOR
    DIANNE-GATSON-RILEY,
10  OFFICIALLY AND IN HER
    INDIVIDUAL CAPACITY, BOOKING
11  SUPERVISOR CAPTAIN RICK
    GASTON, OFFICIALLY AND IN HIS
12  INDIVIDUAL CAPACITY, TRAINING
    DIRECTOR PHIL TAYLOR,
13  OFFICIALLY AND IN HIS
    INDIVIDUAL CAPACITY, CENTRAL
14  CONTROL OFFICER PRESTON WILLS,
    OFFICIALLY AND IN HIS
15  INDIVIDUAL CAPACITY, BOOKING
    ROOM DEPUTY JERRED MARK
16  NECAISE, OFFICIALLY AND IN HIS
    INDIVIDUAL CAPACITY, BOOKING
17  ROOM DEPUTY CATHERINE
    PAVOLINI, OFFICIALLY AND IN
18  HER INDIVIDUAL CAPACITY,
    AMERICAN CORRECTIONAL
19  ASSOCIATION, AND OTHER UNKNOWN
    JOHN AND JANE DOES A-Z, ALSO
20  IN THEIR OFFICIAL AND
    INDIVIDUAL CAPACITIES,
21      Defendants.

22           DEPOSITION OF RODERICK C. MILLER

23      Taken at the offices of Dukes, Dukes,
        Keating & Faneca, 2909 13th Street,
24      Sixth Floor, Gulfport, Mississippi, on
        Friday, February 29, 2008, beginning at
25      10:04 a.m.
```


SIMPSON BURDINE & MIGUES  (228) 388-3130
mburdine@sbmreporting.com



44

```
 1   MS. YOUNG:
 2          I'm sorry.  What did you say?
 3   THE WITNESS:
 4          Yes, I was.  It's been dismissed.
 5   MS. BROOM:
 6      Q.  What year; you don't remember?
 7      A.  I don't remember.  It's probably in the
 8   90s with Laurie.
 9      Q.  Dismissed by the judge as well?
10      A.  Yes.
11      Q.  And then this incident that we're here
12   for today on April 17th, '04, what were the
13   charges in that?
14      A.  Simple assault domestic violence.  That
15   was 4/17/04.
16      Q.  And who was that against?
17      A.  Laurie -- I mean, excuse me.  Veronica
18   Warden Hahn.
19      Q.  What's the disposition of that?
20      A.  Dismissed.  And also there was a
21   stalking charge that she had filed in January or
22   December of the same year, which made it '05,
23   January or June or something, June -- actually
24   June.  They were all dismissed.
25      Q.  Why were they dismissed?
```



45

1    A.   Actually there were three charges she
2  filed against me.
3    Q.   And what were those?
4    A.   Simple assault and stalking.  She said I
5  had delivered flowers to her home, and that never
6  occurred.
7    Q.   Simple assault, stalking.  You said
8  there was a third.
9    A.   There was stalking again, which would
10 have been in January when I lived at Creekwood
11 North Apartments.
12   Q.   Okay.  So the simple assault on 4/17/04
13 and stalking, both of those, you said those were
14 dismissed?
15   A.   Yes.
16   Q.   And why were they dismissed?
17   A.   Because she was lying initially to get
18 me arrested.  And while we were in court, I was
19 sitting -- my attorney was arguing with the
20 prosecutor, Joy Goundas at the -- Judge Roberts at
21 the bench.  And I'm sitting in this chair and
22 she's sitting on the other side of the courtroom
23 and she stands up and walks over to and whispers
24 something in Joy Goundas' ear, the prosecutor's
25 ear.




1 and she lied about that. Of course, you know, he
2 was convicted, but he didn't even do it. There
3 was an admission that she didn't -- but that never
4 occurred.
5     Q.   So these charges were ultimately
6 dismissed, all three?
7     A.   Dismissed without prejudice.
8     Q.   And which judge was that?
9     A.   Judge Bruce Roberts.
10     Q.   Just to back up a little bit to your
11 employment history, where were you employed
12 immediately before the time of this incident?
13     A.   How far back? I was at -- I had worked
14 for Casino Magic from '92, '93 to '99, and I
15 sought employment at the Beau Rivage Casino from
16 '99 to present.
17     Q.   And Casino Magic, what was your
18 responsibility there?
19     A.   I learned how to deal from the Casino
20 Magic. I went through that training school. And
21 from that time, I dealt. I was a dual-rate. I
22 sat box on the Craps table. I was a supervisor.
23 I was a dual-rate supervisor. Some nights I would
24 deal. Some nights I would floor. My
25 responsibilities were game protection, assigning



1   A.   Deputy Judy, Coley Judy.

2   MS. YOUNG:

3        What's the first name?

4   THE WITNESS:

5        Coley, C-o-l-e-y.

6        Then there was another deputy there or

7   an officer.

8   MS. BROOM:

9   Q.   What was his name?

10  A.   I believe his name was Walker.

11  Q.   Walker?

12  A.   Yes.

13  Q.   Okay.  What happened next?

14  A.   And they walked me into the hallway.

15  Which where the apartment was, there were four

16  units in this apartment complex.  There was a

17  community hallway.  The stairs run up the middle

18  into the top floor and then on the bottom floor.

19       He walks over.  And they walk me --

20  escort me to the wall, face me to the wall.  I

21  said, am I under arrest.  He says, no, you're not

22  under arrest, I want to sort this out.  I said,

23  well, I explained to you.  I said, she hit me, the

24  baby come in, she was angry, she slapped me in the

25  chest, she scratched me, and that's what happened.




75

```
 1    Deputy Judy is talking to Veronica, and he comes
 2    over to me.  And then he says, let's walk this way
 3    and he walks me to the car.
 4    MS. BROOM:
 5         Q.    Do you know if he brought your
 6    medication with him at the time?
 7         A.    He was the last -- I saw him have my
 8    medication.  I don't know what he did with it.
 9         Q.    Okay.  So you don't know if he left it
10    at that residence or if he brought it with him?
11         A.    He's the last one that had it.  No.
12         Q.    Okay.  Continue, please.  You walked to
13    the car.
14         A.    It was later described where he had put
15    that medication in my bag supposedly in booking
16    Ron Werby, the investigator, later said he put it
17    in booking in the bag.
18         Q.    But you have no personal knowledge of
19    that?
20         A.    No.  I just have knowledge that he had
21    it last.
22         Q.    But you don't know where he placed it,
23    right?
24         A.    No.
25         Q.    What happened next?  You said you were
```


SIMPSON BURDINE & MIGUES  (228) 388-3130
mburdine@sbmreporting.com



```
 1        Q.   Okay.
 2        A.   And Deputy Judy left, went up to the
 3   booking counter, come back, and brought me to a
 4   room in the back.  And at the end of the booking
 5   hall, there's a room off to the right, which is an
 6   office and they have a desk and that's when Deputy
 7   Judy asked me -- he was asking me personal
 8   questions.  I was still handcuffed, sitting in a
 9   chair.  That was the first time I had seen Deputy
10   Necaise and Pavolini because they were working in
11   the booking room.
12        Q.   I'm sorry.  Where?
13        A.   Deputy Necaise and Pavolini were in the
14   booking room working.
15        Q.   Were they behind the counter?
16        A.   At one point, I believe Deputy Necaise
17   walked through, met us at the door when we come
18   through and Pavolini was behind the booking
19   counter.
20        Q.   Were any other officers present at this
21   time?
22        A.   Preston -- Thomas Preston Wills was in
23   the control booth.  Okay.  I remember seeing a
24   real big guy in the control booth.
25        Q.   Okay.
```

SIMPSON BURDINE & MIGUES  (228) 388-3130
mburdine@sbmreporting.com



```
 1      A.    We go and we sit.  And we got into the
 2   office and I sit there in the chair.  And Deputy
 3   Judy asks me my name, just asked me general
 4   information, I guess, processing information,
 5   address and so forth, so I had given him that
 6   information.  I had asked him if I may make a
 7   phone call because no one knows where I am.  He
 8   responds -- he says, no.  I said, well, may I have
 9   my medication.  He says, no.  I said -- I asked
10   him, well, how long am I going to be here.  Then
11   he continues asking me questions.  I answer his
12   questions.
13         Then he asks me about keys to my
14   residence and to the automobiles.  He says, do you
15   have keys.  I said, yes.  He says, to your
16   residence and a car.  I said, yes.  He says, will
17   you give them to me.  I said, they're my keys.  I
18   said, I would rather keep them.  He says, well, I
19   would -- he says, well, I spoke to your girlfriend
20   and I would like to give her those keys back, give
21   her the keys.  And I said, actually, those are my
22   keys and after what happened today, I'm not going
23   home, I won't be living there anymore, and I'll
24   make arrangements with her mother when I get out
25   and I'd rather give the keys to her mother at that
```




```
 1   THE WITNESS:
 2          Well, I am holding my left hand straight
 3   and my right hand as a fist, and I'm tapping them
 4   together like a punching motion.
 5          Deputy Judy disappears. Necaise turned
 6   around and leaves, so I remain in the room. And
 7   Deputy Judy comes back with some paperwork and he
 8   still asked me about the keys. And I said, well,
 9   those are my keys, I would rather keep them. And
10   I asked him if I could have my medication. I
11   asked him if I -- because of my migraine and the
12   seriousness of it, asked him if I could make a
13   phone call. And at that point, I asked him, I
14   said, look, I said, the medication I take makes my
15   mouth dry, I said, may I have some water. He
16   says, no, you're not getting any water, and the
17   water fountain was right across the hallway by the
18   phone.
19          I hate to do this. May I take a break,
20   please?
21   MS. BROOM:
22          Yes.
23                (Off the record.)
24   MS. BROOM:
25      Q.   We were talking about your mouth was
```


SIMPSON BURDINE & MIGUES  (228) 388-3130
mburdine@sbmreporting.com



```
 1    dry, the water fountain was near.  If you can,
 2    continue from that point.
 3         A.   Yes.  Deputy Judy had appeared.  I asked
 4    him if I may have some water because the
 5    medication makes my mouth dry.  He said, no.  Same
 6    thing with the medical treatment for my migraines.
 7    The answer was no.
 8         Q.   What type of medical treatment did you
 9    request?
10         A.   I requested medication, and he told me
11    I'd have to see a nurse.  I said, well, I would
12    like to see the nurse.  He said, no.
13         Q.   Okay.
14         A.   And that's where that comes in is, you
15    know, during that conversation -- during that time
16    in that room.  Then some -- after that, we've
17    already covered when Necaise was there, Necaise
18    was present and he pointed to me said, I'll take
19    care of him later.  He returned me to the hallway,
20    and I was in the room.  He never did say -- he
21    never did say I was under arrest, never did read
22    my Miranda Rights.  He just said, you're going to
23    jail.
24         Q.   Okay.  So from that room, you returned
25    to the booking area?
```


SIMPSON BURDINE & MIGUES  (228) 388-3130
mburdine@sbmreporting.com

