155

```
 1    your only knowledge is what was testified to at
 2    the trial; is that correct?
 3         A.   Prior to my incident?
 4         Q.   Right.
 5         A.   Yes.
 6         Q.   Okay.  In your complaint, you allege
 7    conspiracy.
 8         A.   Yes.
 9         Q.   In your own words, please tell me what
10    exactly -- who was involved in this conspiracy?
11    MR. CROSBY:
12              Object to the form.  That's a legal
13    question.  But if you can answer that, you can if
14    you want to.
15    MS. BROOM:
16         Q.   Just based on your personal knowledge.
17         A.   My personal knowledge?
18         Q.   What conspiracy has there been in your
19    own opinion?
20    MR. CROSBY:
21              Same objection.
22         A.   Well, there was conspiracy amongst --
23    from testimony from the former jailers who have
24    pled guilty to the violation of rights and color
25    of law from Captain Campbell, Steve Campbell.
```



SIMPSON BURDINE & MIGUES  (228) 388-3130
mburdine@sbmreporting.com



1    A.   I don't believe it was all individuals
2 who entered the booking room.  Whether it was a
3 race or class, maybe they had their own personal
4 reasons for assaulting individuals.  I think the
5 best individuals to ask would be the former jailer
6 Preston Wills who pled guilty to personally
7 beating 100 -- beating 100 inmates personally and
8 having knowledge of 100 more, and there are
9 several other ones who have pled guilty to that
10 conspiracy.  And between five deputies, that is
11 over 1,000 inmates that they've either beaten or
12 had knowledge that other inmates were beaten
13 without intervening.
14    Q.   Are you alleging that only happened to a
15 certain gender or race?
16    A.   I believe it was across all races,
17 white, black, any race, any religion, any, you
18 know, male, female.
19    Q.   You allege that false reports were
20 created.
21    A.   Yes.
22    Q.   What personal knowledge do you have that
23 this, in fact, occurred?
24    A.   From my case?  I have read the
25 narratives that the deputies had written Pavolini,



```
 1    train and supervise.  Tell me which officers you
 2    allege were not properly trained.
 3         A.   According to the state, they have to
 4    have 40 hours worth of training in certain areas,
 5    and they have additional training.  So apparently
 6    according to the state, they met that training
 7    requirement.  But through that, I'm sure it
 8    doesn't say punch people, kick people.
 9         Q.   What officers were not trained properly?
10         A.   I can't answer that because I don't know
11    what training that they did have and did not have.
12    I haven't seen the requirements or training
13    courses.
14         Q.   You allege failure to train and
15    supervise booking room deputies.  Tell which
16    booking room deputies were not properly trained.
17    MR. CROSBY:
18              Object to the form of the question.
19    That is a legal question.
20    MS. BROOM:
21         Q.   Same with that?
22         A.   Yes.
23         Q.   You also make the allegation there was
24    negligent hiring, retention, and failure to
25    discipline or take necessary corrective measures.
```

SIMPSON BURDINE & MIGUES  (228) 388-3130
mburdine@sbmreporting.com



```
 1    I mean, he was over there, but I don't know what
 2    he heard.
 3         Q.   Okay.  Fair enough.  Let's kind of
 4    change gears.  Have you ever seen Rick Gaston in
 5    person before?
 6         A.   Yes, I have.
 7         Q.   Have you ever spoken with Rick Gaston
 8    before?
 9         A.   I held the door open for him one time.
10    I was walking through and he happened to be there.
11    I saw him at the Teel trial.
12         Q.   My question, though, particularly was:
13    Have you ever spoken to him?
14         A.   No.
15         Q.   So I gather the only time you ever heard
16    Rick Gaston's voice is at the Ryan Teel trial; is
17    that correct?
18         A.   Yes, sir.
19         Q.   And I also gather you didn't see or hear
20    Rick Gaston when you were incarcerated at the
21    Harrison County Adult Detention Center on April
22    17th, 2004; is that correct as well?
23         A.   I don't recall seeing Rick Gaston.
24         Q.   So based on that, then, I gather you
25    never overheard Rick Gaston agree to hit or harm
```




1  you in any way while you were incarcerated at the
2  Harrison County Adult Detention Center on
3  April 17th, 2004?
4      A.   No, sir.
5      Q.   As we sit here today, do you know of any
6  conversations that ever existed with Rick Gaston
7  and any individuals or correctional officers at
8  the Harrison County Adult Detention Center where
9  they agreed to harm you?
10     A.   No, sir.
11     Q.   Based on what you testified to earlier,
12 I gather that Rick Gaston didn't use any excessive
13 force against when you were incarcerated at
14 Harrison County Adult Detention Center?
15     A.   No, sir.
16     Q.   So is it also a fair statement to say
17 that you heard no statements from Rick Gaston
18 where he said he deliberately wanted to harm you
19 while you were incarcerated at Harrison County
20 Adult Detention Center?
21     A.   Yes, sir.
22     Q.   Also, as we sit here today, do you have
23 any reason to believe that Rick Gaston
24 deliberately wanted to harm or injure you while
25 you were incarcerated at the Harrison County Adult



194

1    Detention Center?
2        A.   Yes, I do.
3        Q.   You do?
4        A.   Yes.
5        Q.   Okay. Tell us what you know.
6        A.   Rick Gaston, it was common knowledge
7    that his policies, through the testimony of former
8    deputies who have pled guilty who worked under
9    him, under his command, have stated that Rick
10   Gaston implemented policies and procedures, his
11   own policies and procedures of abuse, torture, red
12   light, green light, where they can hit people and
13   where they can't.
14       Q.   And you hold this opinion even though
15   you've never heard Rick Gaston talk other than in
16   front of a jury?
17       A.   I'm sorry. Will you repeat the
18   question?
19       Q.   And you hold this opinion due to the
20   fact that the only time you've ever heard Rick
21   Gaston open his mouth and talk his entire life was
22   at the Ryan Teel trial; is that correct?
23       A.   Yes, that's correct.
24       Q.   So essentially what you're doing is
25   speculating on what Rick Gaston knew about the

SIMPSON BURDINE & MIGUES  (228) 388-3130
mburdine@sbmreporting.com



```
 1   MR. BRENDEL:
 2           The question speaks for itself.
 3       Q.  I want to know whether or not you have
 4   any personal knowledge whether Rick Gaston wanted
 5   to deliberately physically harm you while you were
 6   incarcerated at Harrison County Adult Detention
 7   Center, and if so I want to know about it.
 8   MR. CROSBY:
 9           Object to the form unless you're saying
10   harm him himself or through others.
11   MR. BRENDEL:
12           Through others.
13       A.  Rick Gaston, with the unprovoked attacks
14   of deputies, on inmates, that he supervised and
15   had knowledge of, I believe Rick Gaston didn't
16   care who he harmed and hurt.  It wasn't his
17   concern.  It was the fact that they just had
18   complete knowledge and the conspiracy that
19   surrounded their involvement.
20   MR. BRENDEL:
21       Q.  But your belief isn't based on something
22   you've personally seen with your own eyes with
23   respect to Rick Gaston; am I right?  Is that fair?
24       A.  I haven't seen Rick Gaston assault
25   anyone?
```




```
 1        Q.   And so that's fair, then.
 2        A.   I'm aware that he tased Abra Horn.
 3        Q.   Did you see that happen?
 4        A.   I didn't see him tase her.  It was
 5   through the other testimony of the deputies,
 6   Preston Wills, Ryan Tell who was in that cell.
 7   And he, himself, I believe, admitted to him tasing
 8   Abra Horn through his testimony in trial.
 9        Q.   But you didn't he see that happen,
10   right?
11        A.   No, because I couldn't see in the cell.
12        Q.   And you had never seen Rick Gaston at
13   the Harrison County Adult Detention Center, had
14   you?
15        A.   I don't think so, no.
16        Q.   Now, do you have any personal knowledge
17   as to whether Rick Gaston recklessly monitored his
18   subordinates?  And when I say "personal
19   knowledge," what you've seen, your senses.
20        A.   Have I seen him, is that your question?
21        Q.   Yes.  Do you have any reason to believe
22   from your personal knowledge that Rick Gaston
23   recklessly monitored his subordinates?
24        A.   Personal knowledge, no.
25        Q.   Okay.
```


SIMPSON BURDINE & MIGUES  (228) 388-3130
mburdine@sbmreporting.com



```
 1        A.   Just, again, through the testimony from
 2   his employees, former jailers at the Harrison
 3   County Jail and also -- that's it.
 4        Q.   Okay.  Is it a fair statement that Rick
 5   Gaston didn't know what happened on April 17th,
 6   2004?  And I guess my question is really related
 7   to before these alleged incidents occurred or at
 8   the time they were happening.
 9        A.   I don't know what he had knowledge of.
10        Q.   So you wouldn't have any reason to
11   dispute he didn't know anything about it?
12        A.   I wouldn't have reason to dispute that,
13   nor would I have reason to dispute that he did
14   have knowledge and didn't do anything about it.
15        Q.   And just to be clear, you never heard
16   any conversations in the booking area where Rick
17   Gaston made an agreement to harm you; is that
18   correct?
19        A.   I haven't heard that.
20        Q.   When you were in the booking area at
21   Harrison County Adult Detention Center, can you
22   recall any specific conversations where there was
23   an agreement to physically injure you?
24   MR. CROSBY:
25             Object to the form.  Are you speaking
```

